**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MARYLAND**

| | |
|---|---|
| **VOTERS ORGANIZED FOR THE** | * |
| **INTEGRITY OF CITY ELECTIONS** | |
| 20 South Charles Street, Suite 400 | * |
| Baltimore, Maryland 21201 | |
| | *     CASE#: |
|     Plaintiff | |
| | * |
| **HASSAN GIORDANO** | |
| 1007 Cameron Road, | * |
| Baltimore, Maryland 21212 | |
| | * |
|     Plaintiff | |
| | * |
| **CORTLY D. WITHERSPOON** | |
| 4725 Beauford Street, | * |
| Baltimore, Maryland 21215 | |
| | * |
|     Plaintiff | |
| | * |
| | |
| 1112 West Lafayette Street, Apt. 2B | * |
| Baltimore, Maryland 21217 | |
| | * |
|     Plaintiff | |
| | * |
| **WILLIAM T. NEWTON** | |
| 13823 Hanover Pike | * |
| Reisterstown, Maryland 21136 | |
| | * |
|     Plaintiff | |
| | * |
| **DONALD MORTON GLOVER** | |
| 1142 North Carrolton Avenue | * |
| Baltimore, Maryland 21217 | |
| | * |
|     Plaintiff | |
| | * |
| **CHARLIE METZ** | |
| 2529 Tolley Street, | * |
| Baltimore, Maryland 21225 | |
|     Plaintiff | * |

v.                              *

**BALTIMORE CITY ELECTIONS BOARD**              *
417 East Fayette Street,
Baltimore, Maryland 21202                       *

          Defendant                             *

          *Serve on:*                           *
          Eleanor Wang
          *President*                           *
          Baltimore City Elections Board
          417 East Fayette Street, Rm. 129      *
          Baltimore, Maryland 21202
                                                *

**ARMSTEAD B.C. JONES, SR.**                    *
*In his official capacity as Elections Director*   *
Baltimore City Elections Board
417 East Fayette Street, Rm. 129                *
Baltimore, Maryland 21202
                                                *

                                                *

          Defendant                             *

**MARYLAND BOARD OF ELECTIONS**                 *
151 West Street, Suite 200                      *
Annapolis, Maryland 21401
                                                *

**LINDA H. LAMONE**                             *
*In her official capacity as*                   *
*State Administrator of Elections*
Maryland State Board of Elections               *
151 West Street, Suite 200
Annapolis, Maryland 21401                       *

          Defendant                             *
**************************************************************************************

### COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF AND MANDAMUS

NOW COMES Plaintiffs Voters Organized for the Integrity of City Elections

(VOICE), an unincorporated association of citizens, and individual Plaintiffs Hassan

Giordano, Cortly D. Witherspoon, Dwayne Benbow, William T. Newton, Donald

Morton Glover, and Charlie Metz, jointly and severally, by and through their attorney, J. Wyndal Gordon of the LAW OFFICE OF J. WYNDAL GORDON, P.A., pursuant to F.R.Civ.P. 57 and 65 alleging as true the following:

## I. JURISDICTION AND VENUE

1. This court has jurisdiction over this action and venue is proper in this district pursuant to its complaint about violations of the First, Fourteenth and Fifteenth Amendments of the United States Constitution, 52 U.S.C. §10301, et seq. (Voting Rights Act violation) and 42 U.S.C. §1983 (Civil Rights Violation.)

2. Pendent jurisdiction exists for State Law claims that arise from a common nucleus of operative facts.

3. All acts described in this Complaint occurred within the Northern Division of the federal judicial District of Maryland, thus conferring venue upon this court.

## II. PARTIES

4. Plaintiffs, Voters Organized for the Integrity of City Elections (VOICE), is a voluntary "watchdog" association of Baltimore City, Maryland voters from various political party affiliations, loyalties and backgrounds who are collectively concerned about the lack of (a) integrity in the City election process and (b) the public's ability to have confidence in city election results. VOICE operates exclusively in the City of Baltimore, Maryland. The individual plaintiffs described herein are members of VOICE.

5. Plaintiff Hassan Giordano (Giordano) is an African-American, duly registered Democratic voter and resident of the City of Baltimore, State of Maryland.

6. Plaintiff Cortly D. Witherspoon (Witherspoon) is an African-American, duly

registered Democratic voter and resident of the City of Baltimore, State of Maryland.

7. Plaintiff, Dwayne Benbow (Benbow) is an African-American, duly registered Democratic voter and resident of the City of Baltimore, State of Maryland.

8. Plaintiff, Charlie Metz (Metz) is a Caucasian, duly registered Democratic voter and resident of the City of Baltimore, State of Maryland.

9. Plaintiff, William T. Newton (Newton) is a Caucasian, duly registered Republican voter and candidate for Congress from the 7th District, State of Maryland.

10. That Defendant Baltimore City Elections Board (City Board) is authorized by the Public General Laws of Maryland and is empowered to make rules consistent with State laws to ensure the proper and efficient registration of voters and conduct of elections; it inter alia statutorily mandated to:  (a) oversee the conduct of all elections held in [Baltimore City] and ensure that the elections process is conducted in an open, convenient, and impartial manner;  (b) serve as the local board of canvassers and certifies the results of each election conducted by the local board; (c) provide to the general public timely information and notice, by publication or mail, concerning voter registration and elections; and  (d) it maintains records in accordance with the plan adopted by the State Board under § 2 106 of this title.  See Elect. Code §2-202, et seq.

11. Defendant Armstead B.C. Jones, Sr. (Jones), in his official capacity as Elections Director of the City Board at all times alleged was required to:  (a) appoint the employees of the local board; (b)  train judges of election, COMAR 33.02.03.04; (c) issue voter acknowledgment notices and voter notification cards; (d) verify petitions; and (e) in consultation with the local board, conduct the canvass following

an election.  See Elect. Code §2-206, COMAR 33.08.01.02; Jones was appointed by the local board, Baltimore City Elections Board, pursuant to the election Law Article §2 202(b)(2) to additionally manage the operations and supervise the staff of the Baltimore City Elections Board.

12. The Maryland State Board of Elections (State Board) is a state agency organized under the laws of Maryland and is charged with managing and supervising elections in the State and ensuring compliance with the requirements of the Election Law article and any applicable federal law by all persons involved in the elections process; the State Boards duties are inter alia to:  (a) supervise the conduct of elections in the State; (b) direct, support, monitor, and evaluate the activities of each local board;  (c) maximize the use of technology in election administration, including the development of a plan for a comprehensive computerized elections management system; (d) canvass and certify the results of elections as prescribed by law;  (e) make available to the general public, in a timely and efficient manner, information on the electoral process, and information gathered and maintained regarding elections;  (f) receive, maintain, and serve as a depository for elections documents, materials, records, statistics, reports, certificates, proclamations, and other information prescribed by law or regulation.  Elect. Code §2-102, et seq.

13. On April 26, 2016, the Baltimore City Board of Elections conducted and completed a Primary election process that was fraught with so many errors, omissions and irregularities that it produced seriously questionable results that are unable to be reconciled. Voters are not confident that the process allows the public to determine the actual winners

14. The primary election of April 26, 2016 was an absolute disaster for Baltimore voters who expected their votes to be counted with equal weight as the votes of other citizens under the principle of "one man, one vote."

15. The primary election was the first time in the last century used a paper ballot system in modern history.

### III. STANDING

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 15 as if fully set forth herein:

16. The population of Baltimore City is 63.7% African-American, 29.6% Caucasian,  and 4.2%  Hispanic or Latino, according to the 2010 U.S. Census.  See http://planning.maryland.gov/ msdc/census/cen2010/SF1/AgeRaceProf/ agerace_baci.pdf.  Thus, to the extent that election practices in Baltimore City differed from those elsewhere in the state, particularly in the areas of irregularities and irreconcilable irregularities, those practices are subject to strict scrutiny for purposes of determining violations of Equal Protection.

17.     Plaintiffs hereby allege that African-Americans, Caucasian and Latino voters who resided and/or voted in predominantly African-American Baltimore City suffered injury when they used the challenged voting systems and processes implemented by the City Board in the April 26, 2016, Primary election because they voted in precincts recording a substantial and disproportionate number of systemic and process-based irregularities.

18. The facts set forth in this complaint are specific and peculiar to Baltimore City.  No other subdivision of the State of Maryland experienced the breadth and

depth of problems that were found in Baltimore City during the April, 2016 primary election, and those problems arising out of the matters identified below had a disproportionate impact upon the African-American vote.

19. As it were, Baltimore City residents were injured in as much as they faced a higher probability of their votes not being counted as a result of the voting systems, machinery, and processes implemented by the City Board and approved by the State Board, i.e., vote dilution, and staggering number of irregularities marred any since of confidence in the election results, and caused grievous harm to Plaintiffs thereby violating their right to vote.  The risk of Plaintiffs votes not counting were disproportionate to other jurisdictions with greater numbers of Caucasian voters; the systems, machinery, processes, and procedures implemented by the City Board and approved by the State [Board] in which Plaintiffs voted increased the likelihood that their votes will not be counted.

20. That Plaintiffs submit that the "probabilistic injury" as herein alleged is enough injury in fact to confer standing in the undemanding Article III sense.

21. That injury to Plaintiffs are both provable and traceable to Defendants' actions given the facts alleged in this complaint because vote dilution, which is directly related to voting (the most basic of political rights), is sufficiently concrete and specific. All qualified voters have a constitutionally protected right to vote and to have their votes counted.

22. Baltimore City has a history of discriminatory practices with respect to elections. In1970, an election was so fraught with problems that eight precincts had to undergo a re-vote. In 2003 and 2004, Baltimore City had a bifurcated primary and

general election.  The voters of the city elected by referendum to change their charter to move the Mayoral election to the Presidential election year of 2004.  The General Assembly, however, refused to move the primary election from its previous scheduled date. Thus, there was a 14-month lag between the primary election and the general election. This created a significant ballot access hurdle for prospective candidates and the voters who might have wished to vote for them.  The incumbent Mayor who sought re-election in that election was Caucasian.

23. Plaintiffs also have standing to challenge violations of State Election laws because they are duly registered voters.  See Md. Election Code § 12-202.  Plaintiffs submit that the acts and/or omissions of the City and State Boards are either inconsistent with the Election article or other law applicable to the elections process, and that said acts and/or omissions may changed or have changed the outcome of the election.  Id.

24. To be clear, Plaintiffs are challenging the Election laws as applied by the City and State Boards, implemented through a series of flawed administrative systems, processes, and procedures, which were approved by the State in the form of re-certification of admitted irreconcilable irregularities, that allows significantly inaccurate systems of vote counting to be imposed upon some portions of the electorate and not others without any rational basis; Plaintiffs further believe these actions run afoul of the due process clause of the U.S. Constitution, 14th and 15th Amendments to the Constitution, and disproportionately impact African-American-American voters.

## IV. FACTS COMMON TO ALL PLAINTIFFS

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-20 as if fully set forth herein:

25. That on April 26, 2016, the Baltimore City Board of Elections conducted and completed a Primary election process that was fraught with so many errors and irregularities that it produced doubtful results that are unable to be reconciled to determine who the true winners and runner-ups were in said election.

26. The primary election on April 26, 2016, was a disaster for many Baltimore voters who expected their votes to be counted with equal weight as the votes of other citizens.

27. The primary election was the first time that the city used a new voting system using optical scanners; the City and State Elections Boards received $11 million in supplemental funds to recruit and train elections judges; they had two years to plan for the 2016 primary.

28. In spite of the long lead-time and the extra funding, the Baltimore City Board was woefully unprepared to conduct an election; the City Board actually held a first training session for at least 100 elections judges on the Monday evening before the Tuesday morning primary.

29. Unsurprisingly, a number of polling places opened late because the judges either tardy or failed to appear for work; the senatorial campaign of the Honorable Donna Edwards, member of Congress, filed suit to extend the hours of approximately 15 polling places that opened late. She was able to convince a circuit court judge to issue an emergency court order to keep four polling places open an

hour later than scheduled.

30.  Unfortunately, the court order only applied to those polling places which opened up at least 45 minutes late, and did not apply to at least nine other polling places that opened 30 minutes late; upon information and belief, some prospective voters were turned away due to the late openings.

31. When the polls were opened, the City Board abandoned all standards of quality control and compliance with laws pertaining to the right to vote.  At locations throughout the city, voters filled out ballots in makeshift carrels, placed them in manila folders, and carried them to optical scanners that were used to tabulate votes.

32. In numerous cases, elections judges viewed the voters' selections of candidates before placing the ballots in the scanners.  They had not been instructed to respect the voter's right to vote secretly.

33. Polling places ran out of provisional ballots, and supplies to fill-out ballots.

34. At the conclusion of the voting on the 26th of April, 2016, the information gathered by the optical scanners was supposed to be transferred to thumb drives, which were to be promptly forwarded to the City Board for tabulation of the vote. Eight thumb drives went missing on election night. Seven were ultimately found the next day. The thumb drive from one polling place remains missing to this day.

35. Elections judges are supposed to perform their duties without partiality to any candidate.  During Election Day, at least two campaign workers were allowed to work as election judges to fill vacancies. Upon information and belief, the chief

judges at polling places historically have been appointed upon the recommendation of their State Senators.

36. Voters with Baltimore County addresses mistakenly were allowed to vote in the Mayoral primary; in some locations, voters were given ballots that had blanks for the wrong City Council districts.

37. Md. Election Code §1-101(ll) allows for provisional ballots for voters whose eligibility to vote cannot be verified on the spot on Election Day; the provisional ballots are to be placed in sealed envelopes with the voters' information written on the outside of the envelopes. Provisional voters are asked to sign the ballots.

38. That under law, the verification process is to take place days after the election; in numerous polling places, the law was disregarded; hundreds of provisional ballots were scanned and the votes counted without bothering with the verification process. See e.g. Elect. Code. §11-303 et seq., Other provisional ballots were misplaced.

39. Candidate for office, Ertha Harris, was told that she was ineligible to vote at her home polling place. She was sent to another polling place where she likewise was told that she was ineligible to vote. She then went to back to her home polling place and voted with a provisional ballot.

40. Ex-offenders, who as of March 10, 2016 were given the right to vote after they secured their release from prison, were discouraged from voting and subject to voter suppression. Plaintiff, Dwayne Benbow, was eager to exercise his full rights of citizenship as part of his re-entry into society. Plaintiff Benbow received a letter that

falsely advised him that he could not register to vote. He nevertheless appeared at his polling place and sought to vote but was given a provisional ballot. He endured lengthy discussions with election personnel before his ballot was accepted.

41. Approximately three dozen other ex-offenders endeavoring to re-enter society received the same form letter. The application to vote contained language telling ex-felony offenders that they were not allowed to vote. The letter was widely publicized in the media. Upon information and belief the existence of the letter, along with the admonition on the application, had a chilling effect on a category of eligible voters, thus suppressing turnout.

42. When the day was over and the votes counted, the amount of votes tabulated exceeded the amount of control cards that measured the number of actual voters who were deemed qualified to vote. The number of votes counted exceeded the number of verified and qualified voters by more than 1,000. The City Board also acknowledged that 80 provisional ballots had not been counted.

43. Notwithstanding the variance between the number of qualified voters and votes actually cast, the Defendant City Board convened on May 06, 2016 as a Board of Canvassers pursuant to Election Article §11-308(b).

44. At the behest of Defendant Jones, the City Board certified that the results of the primary election were verified and accurate. The certification was a wrongful, and intentional misrepresentation of the election results.

45. After the certification was transmitted, the State Board examined the discrepancy between the number of ballots counted and the number of qualified voters who came to the polls and decertified the City Board's certification of the

election.  The State Board then commenced a review of the primary election for the purpose of conducting a "reconciliation" of the results.

46. The City Board blamed the State Board for the number of problems they were facing by stating in a Baltimore Sun article:

> They [State Board] are supposedly the state agency that oversees 24 jurisdictions, but the first time I heard from her was yesterday," Jones said of Lamone. "They [State Board] were changing all the rules and procedures.  The manual they printed was outdated.  I don't know what they expected people to do at the polls."
>
> *See* Luke Broadwater, "Baltimore's election results decertified, state begins precinct-level review of irregularities" Baltimore Sun, May 12, 2016

47. In other words, City Board director Jones, accused the state of bungling the rollout of new machines and failing to adequately prepare local officials running the elections.  He lamented that confusion over provisional ballots was fueled by constant changes in procedures mandated by the state, including after election judges were trained.  *See* F. Nirappil, "Maryland decertifies Baltimore election results, investigates irregularities" Washington Post, May 12, 2016.

48. The State Board concomitantly compounded the errors of the City Board by conducting its reconciliation in two private sessions on Friday, May 13, 2016 and Monday May 16, 2016; these reconciliation sessions were not monitored by camera.

49. At the conclusion of the closed Monday session, a candidate retained counsel and sued to open the proceeding to the public.  See *Dixon vs. Maryland State Board of Elections,* et al., 24C16002985, Baltimore City Circuit Court.

50. As a result, the State Board relented from its practice of closed sessions and opened the reconciliation process to very limited observation by candidates and

the press. Observers were restricted to an area of the building that was far removed from the actual work being done.

51. At the conclusion of its reconciliation process, on May 24, 2016, the State Board produced a spreadsheet that detailed the errors and discrepancies in the city primary. The State Board found that the variance between the number of votes counted and the eligible voters could not be reconciled in 74 out of 298 precincts. These numbers represent 22% of the total precincts in the election. The State Board records also found that only 29 precincts had been counted without discrepancies during the initial count by the City Board. The initial error rate, when measured by precinct, was thus approximately 86%.

52. The State Board also found that the City Board had accepted 1,188 provisional ballots without verifying whether the voters were in fact authorized to vote; the State Board also found that the City Board had 465 uncounted provisional ballots in its possession. This number differed from the 80 uncounted ballots that previously had been disclosed by the City Board.

53. There was no explanation for the discrepancy in this number of provisional ballots and the 80 uncounted ballots acknowledged by the City Board at the time of its fraudulent certification of the election results.

54. At the conclusion of its secretive reconciliation process, the State Board returned its findings to the City Board. Defendant Jones stated that he would count the 465 "found" provisional ballots and re-certify the election. When he did so, the "found" ballot count was 551.

55. During the counting of provisional ballots, the City Board claimed that

2,379 ballots had to be disqualified because the prospective voter was attempting to vote in the wrong party primary. The City Board did not allow any observers to verify this claim, however.

56. The counting of 1,188 provisional ballots without verification of the voters' qualifications had the effect of diluting the voting strength of qualified voters.

57. On May 25, 2016, the City Board re-certified the election results of the April 26, 2016 Primary elections, despite the factual data proving that some 1,188 votes cast were not guaranteed to have been cast by legitimate Baltimore City voters and despite the overwhelming evidence that many voters had been adversely affected by the handling of said process.

## V. FACTS SPECIFIC TO INDIVIDUAL PLAINTIFFS

### A. Hassan Giordano

58. Plaintiff Hassan Giordano is the founder of VOICE, a voluntary watchdog association of City voters who are concerned about city voting processes, and committed to preserving or restoring integrity in city elections.

59. Giordano is also a registered voter in the 3rd councilmanic district where he was surprised and dismayed to learn of the pervasive voting irregularities that occurred during the primary.

60. Giordano took a particular interest in the citywide mayoral and judges elections which were decided by very thin margins. Of particular concern to note was the circuit court judges race where one of the sitting judges was bested by a Republican challenger by 308 votes. Given the fact that over 1188 votes that were

counted but note properly vetted to determine whether they were cast by eligible voters,  Giordano's vote was likely diluted by the staggering number of irregularities that plagued the April 26, 2016, primary election as identified throughout this complaint, and such dilution is inconsistent with the Election article or other law applicable to the elections process, and may changed or have changed the outcome of the election.

### B. Cortly D. Whitherspoon

61. Plaintiff Cortly D. Witherspoon voted in the 7th councilmanic district of Baltimore City where poorly trained election judges presided over the polling place.

62. The 7th councilmanic seat was hotly contested, where the winner bested the first runner-up by 268 votes, and the fourth runner-up by 524 votes.  City wide, specifically regarding the circuit court judges race, one of the more popular sitting judges was bested by a challenger for judicial office on the Republican side.

63. The 7th councilmanic district is also the district where at least one of the eight ballot results uploaded on thumb drives was lost and never recovered.  Based upon all of the irregularities stated above and throughout this complaint, Witherspoon's vote was likely diluted, and such dilution is inconsistent with the Election article or other law applicable to the elections process, and may changed or have changed the outcome of the election.

### C. Donald Morton Glover

64. Plaintiff Donald Morton Glover, as  publisher of BMORENEWS.com observed a mayoral campaign worker attempt to intimidate his neighbor, Tina Anderson, who lived across the street from his residence.  Plaintiff collected

information from Anderson's daughter, Shanika Lane, who alleged that she and many other residents were recruited to vote for a particular mayoral candidate in exchange for $100.00. This scheme was highly published in mainstream media and BMORENEWS.com.

*See* VideoLink: http://www.bmorenews.com/home/portfolio_video/tina-anderson-who-lives-across-the-street-from-pugh-walbrook-junction-office-shares-insight-4-26-16-interview-followed-unrest-at-office-where-workers-upset-about-not-getting-a-12hour-job/.

65. Based upon all of the irregularities stated above and throughout this complaint, Glover's vote was likely diluted, and such dilution is inconsistent with the Election article or other law applicable to the elections process, and may changed or have changed the outcome of the election.

66. Title 52, §10307(c) of the United States Code provides that whoever pays or offers to pay or accepts payment either for registering to vote or for voting is subject to a fine not more than $10,000 or imprisonment not more than five years. The act of paying or offering compensation or reward unduly dilutes the voting rights of individual voters who are not compensated for their vote.

67. Md. Election Code §13-602(a)(1) also provides that a person may not directly or indirectly give, offer, or promise money, aid, a gift, an advantage, a preferment, an emolument, or any other valuable thing to another person for the purpose of inducing or procuring that person to vote or refrain from voting for or against an individual, question, or measure at an election.

68 The offer of jobs and payment diluted the vote of Glover and other citizens

who were not paid to vote.

**D. William T. Newton**

60. Plaintiff William T. Newton Is a Caucasian, Republican, male candidate for the 7th Congressional district and hotly contested race where he was bested by his opponent by 4 votes. The irregularities described above make the outcome of his electoral race disputable.

61. Newton was also a voter in his Congressional District pursuant to Elect. Code §12-202.

62. The vote buying scheme was solely aimed at minority voters, which had the impact of diluting the voting support of Newton and other Caucasian candidates.

63. The various facts set forth above impaired Newton's First Amendment rights to run an unfettered campaign for office.

**E. Dwayne Benbow**

64. Dwayne Benbow is a duly registered voter and ex-offender who was advised via letter by the City Board that he may not be eligible to vote due to his ex-offender status. The law in Maryland changed as of March 10, 2016, giving ex-felons the right to vote so long as they have completed serving a court-ordered sentence of imprisonment. Elect. Code §3-102(b)(1), *see also*, (House Bill 980 of the 2015 Regular Session [Gubernatorial Veto Override, February 9, 2016]).

65. That the State Board is statutorily required to (a) define, maintain, and administer the statewide voter registration list; (b) ensure the currency and accuracy of each individual voter's registration record with the local board; (c) instruct the local boards on: (i) processing voter registration applications and name

and address changes; and (ii) entering voter registration information into the statewide voter registration list.

66. That despite Benbow being an authorized, registered voter in his district, the City Board election judges would not allow him to vote on a regular ballot but instead forced him to vote on a provisional ballot or not vote at all.

67. The experience endured by Benbow was both intimidating and humiliating. Benbow had presented his identification card and had to discuss his matter with election judges for over 40 minutes and did not seem to get any resolve. They had originally turned him away but he remained persistent.

68. Thirty four (34) additional letters similar to the one received by Benbow were issued to ex-offenders throughout Baltimore City, according to the City Board. Based upon all of the irregularities stated above and throughout this complaint, Benbow's vote was likely diluted and suppressed, and such dilution and suppression both are inconsistent with the Election article, the Voting Rights Act, or other law applicable to the elections process, and may changed or have changed the outcome of the election.

**F. Charlie Metz**

69. Plaintiff Charlie Metz is a White Caucasian male voter who was also a candidate for the 10th Councilmanic seat in the City. He was bested by his opponent and winner of the race by 130 votes.

70. Metz observed first hand voter irregularities at polling locations in District 10 at early voting locations, and throughout the City of Baltimore as more fully described in this complaint.

71. Metz noted that polls were opened late, voters were given two or more ballots, provisional ballots were counted with regular ballots, and voters were turned away who had previously registered.

72. Metz's vote was diluted due to the practice of providing more than one ballot to voters without controls to assure that they didn't vote twice.

73. Metz's vote also was diluted by the vote buying scheme. Metz belongs to the national racial majority, but is a minority in Baltimore City. The vote buying scheme was solely aimed at minority voters, which had the impact of diluting the vote of Metz and other Caucasian candidates and voters.

74. The various facts set forth above impaired Metz's First Amendment rights to run an unfettered campaign for office.

### COUNT ONE: DECLARATORY JUDGMENT and MANDAMUS

75. Plaintiffs repeat the assertions of paragraphs one through seventy-four above.

76. The Baltimore City primary election of 2016 is incomplete in that the results of 74 precincts have not been conclusively reconciled with respect to the numbers of voters who appeared on election day and the numbers of ballots that were counted. In some of the precincts, voters' ballots were not counted. In other precincts, some ballots were either counted more than one time or the ballot boxes were stuffed with extra ballots.

77. Additionally, there is no practical way to account for the votes that were illegally produced through the promise of jobs and payment and the provision of chicken boxes and snack boxes.

78. The sum effect of all of the irregularities, the uncounted ballots, the ballots that were improperly counted, and the ballots that were induced by offer of money or jobs makes the primary election of 2016 un-certifiable.

79. The facts alleged above present an irreparable harm to Plaintiffs' Constitutional Rights, including their right to vote and to have their votes counted. Plaintiffs are likely to succeed on the **merits**, they will likely suffer irreparable harm absent an **injunction**, the balance of hardships weighs in their favor;  and an **injunction** is in the public interest.

80. The conducting of an election is a non-delegable, non-discretionary duty of the Defendant City Elections Board, Defendant State Elections Board, Defendant Armstead Jones and Defendant Linda Lamone.

81. The conduct of Defendants constituted the use of color of authority, statute, ordinance, regulation, custom, or usage to deprive all of the Plaintiffs of their Constitutional Rights, thereby permitting relief under 42 U.S.C. §1983

WHEREFORE, your Plaintiffs request this Honorable Court:

(a) to pass an order declaring the certification of the Baltimore City Primary Election of 2016 to be null and void;

(b) to pass an order enjoining Defendants from attempting to certify the 2016 Baltimore City Primary Election;

(c) to  pass a Writ of Mandamus requiring the Defendants to re-run the 2016 Primary Election on the earliest practicable date; and

(d) to provide Plaintiffs with such other and further relief as the nature of this cause might require including an award of attorneys fees.

## COUNT TWO: APPOINTMENT OF FEDERAL OBSERVER

82. Plaintiffs repeat the assertions of paragraphs one through eighty-one above.

83. The chaotic and error-filled election process in the 2016 Baltimore City primary election deprived the Plaintiffs and other voters of their rights under the Fourteenth and Fifteenth Amendments to the Constitution by unfairly diluting their votes and by failing to count votes. To this day, more than one month after the election, there are 77 of the city's 296 precincts where the State Board asserts that the difference in the number of voters who appeared at the polls and the number of ballots "cannot be reconciled."

84. The respective City and State Boards have denied the gravity of the situation. The Chairperson of the City Board, Elenanor Wang, told the newspaper:

> "Nothing is ever perfect, but we absolutely feel confident that ... our judges were doing the very best they could," Wang said. "We have an excellent staff and our director is no exception. He is outstanding."
>
> Y. Wenger and M. Dresser, "Baltimore election chief defends primary process amid criticism," Baltimore Sun, May 2, 2016.

85. In the absence of oversight, reform, and change of personnel, there is absolutely no assurance that the essential agency will correct the numerous errors and omissions that have led the electorate to its present situation of uncertainty.

¶ United States Code Title 52 §10302 provides:

> Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court shall authorize the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with section 1973d [1] of title 42 to serve for such period of time and for such political

subdivisions as the court shall determine is appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of such observers is necessary to enforce such voting guarantees or (2) as part of any final judgment if the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in such State or subdivision: *Provided*, That the court need not authorize the appointment of observers if any incidents of denial or abridgement of the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

86. The incidents of denial and abridgement of the right to vote, through suppression and dilution of votes, have been numerous and have not been promptly and effectively corrected by state or local action. There is reasonable probability of their recurrence in the future.

WHEREFORE, your Plaintiffs pray this Honorable Court

(a) to pass an order requiring the Director of the office of Personnel Managmeent to appoint Federal observers for the Maryland State Elections Board and the Baltimore City Elections Board;

(b) to pass an order instructing said Federal observers to supervise immediate corrective action to cure the errors and omissions found in the 2016 Primary Election for Baltimore City;

(c) to pass an order requiring said Federal observers to oversee systemic changes in practices, procedures and personnel to avoid future reoccurrences of the errors and omissions found in the 2016 Primary Election for Baltimore City;

(d) to retain jurisdiction over this case until systemic changes in practices, procedures and personnel to avoid future reoccurrences of the errors and omissions found in the 2016 Primary Election for Baltimore City; and

(e) to provide Plaintiffs with such other and further relief as the nature of this cause might require including an award of attorneys fees.

Respectfully Submitted,

/s/
_____
J. Wyndal Gordon
Fed. Bar No.: 23572
**THE LAW OFFICE OF**
**J. WYNDAL GORDON, P.A.**
20 South Charles Street, Suite 400
Baltimore, Maryland 21201
410.332.4121 o
410.347.3144 f
jwgaattys@aol.com