## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **VOTERS ORGANIZED FOR THE INTEGRITY OF ELECTIONS** *et al.*, **Plaintiffs** | * | |
| | * | |
| | * | |
| **v.** | * | **CIVIL NO.  JKB-16-1788** |
| | * | |
| **BALTIMORE CITY ELECTIONS BOARD** *et al.*, **Defendants** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM</u>

### *I.  Background*

The organization entitled Voters Organized for the Integrity of City Elections ("VOICE"), along with six individuals—Hassan Giordano, Cortly D. Witherspoon, Dwayne Benbow, William T. Newton, Donald Morton Glover, and Charlie Metz—filed this lawsuit on June 1, 2016, against the Baltimore City Elections Board ("City Board"), Armstead B.C. Jones, Sr., the Maryland State Board of Elections ("State Board"), and Linda H. Lamone.[1]  Plaintiffs seek invalidation of the April 26, 2016, primary election ("Primary") in Baltimore City, appointment of federal observers, and other relief.  (Compl., ECF No. 1.)  Pending before the Court is Defendants' motion to dismiss (ECF No. 10), which has been briefed (ECF Nos. 11 and 12) and is ready for decision.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2016).  The motion will be granted.

---

[1]  Plaintiffs filed an amended complaint on June 7, 2016 (ECF No. 4), and that is the operative version that will be addressed in this opinion.

## II.  Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  An inference of a mere possibility of misconduct is not sufficient to support a plausible claim.  *Id.* at 679.  As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.

## III.  Allegations of the Complaint

VOICE is alleged to be a voluntary "watchdog" association of Baltimore voters from various political backgrounds and party affiliations "who are collectively concerned about the lack of (a) integrity in the City election process and (b) the public's ability to have confidence in city election results."  (Am. Compl. ¶ 4.)  The individual Plaintiffs, with one exception, are registered Democratic voters in Baltimore; the one who is not is Plaintiff Newton, who is a Republican voter in Baltimore County, and who unsuccessfully ran for the Republican nomination for the Seventh Congressional District, which encompasses part of Baltimore County and part of Baltimore City; Newton lost his bid by 45 votes.  (*Id.* ¶¶ 5–10.)  Newton and Metz

are Caucasian, while the other individual Plaintiffs are African-American.  (*Id.*)  Metz ran for the Democratic nomination for the Tenth Councilmanic District in Baltimore and lost by 130 votes. (*Id.* ¶ 8.)  Giordano, Witherspoon, Benbow, Glover, and Metz cast votes in the Primary (Benbow voted via provisional ballot).  (*Id.* ¶¶ 41, 61, 62, 65, 78, 85.)

About the Primary, Plaintiffs allege the City Board "conducted and completed a Primary election process that was fraught with so many errors, omissions and irregularities that it produced seriously questionable results that are unable to be reconciled."  (*Id.* ¶ 14.)  Plaintiffs fault the use of a paper ballot system, the machinery implementing the system, the lack of training given to election judges, "and the humongous number of irregularities, inclusive of misinformation, and illegal activity arising out of at least one candidates [*sic*] bid for office"; they claim the result from these problems was a violation of the Fourteenth Amendment and Fifteenth Amendment rights of all Plaintiffs and the First Amendment rights of the two candidate Plaintiffs.  (*Id.* ¶ 16.)

Plaintiffs claim that both the African-American votes and the Caucasian votes were "diluted and/or suppressed."  (*Id.* ¶ 19.)  They also implicitly allege that jurisdictions with greater numbers of Caucasian voters carried a lower risk than the City, whose population is 63.7% African-American (*id.* ¶ 17), of votes not being counted.  (*Id.* ¶ 20.)  They further claim "that the 'probabilistic injury' as herein alleged is enough injury in fact to confer standing in the undemanding Article III sense."  (*Id.* ¶ 21.)  They contend their case presents violations of the Equal Protection Clause (*id.* ¶ 17), the Voting Rights Act (*id.* ¶ 22), and Maryland state election laws (*id.* ¶ 24).

Specific problems alleged include a failure of some election judges to show for work, late opening of some polling places, misinformation given to voters about their voting precincts,

voters' ability to cast regular ballots (perhaps, more correctly, inability to cast regular ballots), failure of some election judges to respect voters' right to vote secretly, inadequate supply in some polling places of provisional ballots, some election returns not being accounted for on election night because of missing thumb drives, some Baltimore County voters voting in the City's mayoral primary, some ballots having blanks for the wrong councilmanic districts, the counting of provisional ballots, a letter wrongly advising some three dozen ex-offenders they could not register to vote, 1,100 more votes counted than the number of voters deemed qualified to vote, belated opening to the public of the State Board's vote reconciliation process, and the small number of precincts found not to have discrepancies between number of registered voters and number of votes cast compared to the much greater number of precincts with discrepancies. (*Id.* ¶¶ 29–55.)  After the State Board initially decertified the election results and conducted its review (*id.* ¶ 46), the City Board recertified the results

> despite the factual data showing that:  (a) some 1,188 votes cast were not guaranteed to have been cast by legitimate Baltimore City voters, (b) around 1685 provisional ballots were mishandled and 2,379 ballots were disqualified for voting in the wrong Primary, and (c) the overwhelming evidence that many potential voters had been adversely affected by the handling of the Primary by either being (i) turned away, (ii) misinformed, (iii) ill-advised, or (iv) not properly instructed on the voting systems, process, machinery, and/or procedures, by City officials and poorly trained election judges.

(*Id.* ¶ 57.)

Plaintiffs also make allegations specific to each individual Plaintiff.  They allege as to Giordano, "Given the fact that over 1,188 votes that were counted, but not properly vetted to determine whether they were cast by eligible voters, Giordano's vote was more likely than not diluted by the staggering number of irregularities that plagued the April 26, 2016, primary election . . . ."  (*Id.* ¶ 61.)  As to Witherspoon, Plaintiffs allege he voted in the 7th councilmanic district "where poorly trained election judges presided" (¶ 62) and "where at least one of the

eight thumb drives containing ballot results was lost and never recovered.  Based upon all of the irregularities . . . , Witherspoon's vote was likely diluted . . . ." (*id.* ¶ 64).[2]  Next, Plaintiffs allege Glover voted in the 9th councilmanic district "where poorly trained election judges presided" and, further, where he "observed a mayoral campaign worker attempting to intimidate his neighbor"; Glover "collected information from [the neighbor's] daughter . . . who alleged that she and many other residents were recruited to vote for a particular mayoral candidate in exchange for $50.00 - $100.00." (*Id.* ¶ 65.)  Similarly to Giordano, Glover's vote was allegedly "more likely than not diluted" because of the "over 1,188 votes that were counted, but not properly vetted." (*Id.* ¶ 67.)  Also, "[t]he offer of jobs and payment diluted the vote of Glover and other citizens who were not paid to vote." (*Id.* ¶ 71.)

Regarding Newton, who unsuccessfully ran for a seat in Congress, Plaintiffs allege the irregularities make the outcome of his race "substantially disputable." (*Id.* ¶ 72.)  Additionally, they allege, "The vote buying scheme was solely aimed at minority voters, which had the impact of diluting the minority voting support of Newton and other Caucasian candidates." (*Id.* ¶ 74.)  Also, Plaintiffs allege,

> The various facts set forth above impaired Newton's First Amendment rights to run an unfettered campaign for office.  The act of certifying an election with a grossly inaccurate tabulation and report of votes cast for Newton, imposed severe burdens on . . . Newton's electoral participation, and on associational freedoms.

(*Id.* ¶ 75.)

As to Benbow, Plaintiffs allege he received a letter indicating that his status as an ex-offender on probation prevented him from being eligible to vote, and that the "election judges would not allow him to vote on a regular ballot but instead forced him under duress to vote on a provisional ballot or not vote at all," which was an intimidating and humiliating experience for

---

[2]  Elsewhere in their complaint, Plaintiffs allege that seven of the eight thumb drives were found the next day.  (*Id.* ¶ 35.)

him.  (*Id.* ¶¶ 76, 78, 79.)  Plaintiffs further allege that thirty-four people received the same letter Benbow received.  (*Id.* ¶ 80.)  Plaintiffs contend that because of all of the irregularities, "Benbow's vote was likely diluted and suppressed."  (*Id.* ¶ 81.)

Last, as to Metz, Plaintiffs allege he observed irregularities such as polls opening late, voters given two or more ballots, provisional ballots counted with regular ballots, and registered voters being turned away.  (*Id.* ¶ 84.)  Plaintiffs allege Metz's vote was diluted by the practice of providing more than one ballot to voters without assuring they did not vote twice, and they also allege his vote was diluted by the vote buying scheme; they claim the irregularities "impaired Metz's First Amendment rights to run an unfettered campaign for office . . . [by imposing] severe burdens on . . . Metz's electoral participation, and on associational freedoms."  (*Id.* ¶¶ 85– 87.)

Plaintiffs request relief in two counts.  In Count One, they request this Court declare the April 26, 2016, Primary null and void, enjoin Defendants from attempting to certify the Primary's results, and require "Defendants to re-run the 2016 Primary Election on the earliest practicable date."  (*Id.* Count One Prayer.)  In Count Two, Plaintiffs request the Court require the appointment of federal observers for both the State Board and the City Board, require the federal "observers to supervise immediate corrective action to cure the errors and omissions" of the Primary, require the observers "to oversee systemic changes in practices, procedures and personnel to avoid future reoccurrences of the errors and omissions" of the Primary, and "retain jurisdiction over this case until systemic changes in practices, procedures and personnel [are made] to avoid future reoccurrences of the errors and omissions" of the Primary.  (*Id.* Count Two Prayer.)

## IV.  Analysis

Preliminarily, the Court *sua sponte* considers the issue of standing.  The Court concludes that VOICE has associational standing on behalf of its members.  *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) ("'[A]n association has standing to bring suit on behalf of its members when:  (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit.'").  As for the Voting Rights Act claim, Newton has no standing under the Act as a candidate, rather than as a voter in Baltimore City.  *See White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 702-03 (E.D. Va. 2004) ("It is well-settled that unsuccessful candidates lack standing to sue under the Voting Rights Act of 1965"; purpose of Act is to protect minority voters, not candidates), *aff'd* 134 F. App'x 641 (4th Cir. 2005).  However, because the Voting Rights Act ("VRA") claim may be considered as to the other Plaintiffs, this determination does not affect the outcome of the case.

### A.  Laches

All Defendants have joined in a motion to dismiss.  Their first stated ground is laches based upon late filing of the complaint and late service on Defendants.  Because they present material outside of the complaint to support their argument on this point, and because the Court is including those materials in its consideration pursuant to Federal Rule of Civil Procedure 12(d), Defendants' motion, as to this issue, will be treated as a motion for summary judgment.  When considering a motion for summary judgment, the Court is governed by the following standard:

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

Defendants argue Plaintiffs' complaint is barred by laches for two reasons: (1) they delayed filing their complaint until well past the time provided in Maryland statutes for mounting an election challenge, and (2) they delayed serving Defendants until six weeks after the complaint was filed. The Court has considered the parties' arguments on this issue and concludes the complaint is barred to the extent of Plaintiffs' request for invalidation of the April 2016 Primary and their concomitant request for a mandated "rerun" of the Primary.

"Laches is an equitable doctrine that can be raised by a defendant as an affirmative defense to a claim, and requires that the defendant show '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Dann Ocean Towing, Inc.*, 756 F.3d 314, 318 (4th Cir. 2014).  In an unpublished opinion, the United States Court of Appeals for the Fourth Circuit has applied the doctrine of laches in the context of an election.  *Perry v. Judd*, 471 F. App'x 219 (4th Cir. 2012).  Although the unpublished opinion is nonprecedential, *see El v. Max Daetwyler Corp.*, 451 F. App'x 257, 257 (4th Cir. 2011) (unpublished) ("Unpublished opinions are not binding precedent in this circuit."), it is nevertheless persuasive authority on the appropriate consideration of this issue.  As did the *Perry* Court, this Court concludes that Plaintiffs have exhibited a lack of diligence in prosecuting their suit to the prejudice of the Defendants.

Diligence in the compressed timeline applicable to elections is measured differently from how it might be measured in other contexts.  Consequently, Plaintiffs' argument that they served Defendants within the ninety-day period of service required by Rule 4(m) and, therefore, showed diligence, holds no water.  Further, with the exception of who was declared the winner of each race, Plaintiffs' complaints about irregularities on the day of the Primary as well as the pre-Primary mailing of the ex-offender letter could have been challenged immediately after those events.

Defendants have pointed out the necessary deadlines that affect the timing of a primary election in relation to the general election in early November.  Under governing statutes, the State Board is required to "certify the content and arrangement of each ballot . . . for a general election[] at least 55 days before the election."  Md. Code Ann., Elec. Law § 9-207(a)(2) (LexisNexis Supp. 2016).  Therefore, to meet that statutory requirement for the 2016 general

election, to be held on November 8, the State Board would have had to certify the general election ballot no later than September 14. Moreover, under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20302(a)(8)(A), absentee ballots must be transmitted to uniformed and overseas voters at least 45 days in advance of any federal election; in 2016, that date would be no later than September 24 for the general election. Obviously, the results of a primary election are a necessary prerequisite for composition of a general election ballot. Thus, a rerun of the Primary would have been necessary a reasonable time before the September 14 ballot certification date in order for its results to be certified and placed on the general election ballot. Even if the rerun were regarded as a "special primary election" under Elec. Law § 9-207(a)(3), the content and arrangement of the ballot for that election would have to be certified at least 18 days earlier, which backs up well into August. As the Fourth Circuit has opined, "Ballots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Perry*, 471 F. App'x at 226. Furthermore, the UOCAVA deadline for transmission of absentee ballots for a rerun primary election is also 45 days in advance of that election. So, even presuming perfect timing, the very latest date on which absentee ballots could be transmitted under federal law for a rerun primary election would have been August 10, 2016.

Despite this obviously tight schedule, Plaintiffs waited until mid-July to serve Defendants.[3] (Defs.' Mot. Dismiss, Ex. 1, 2.) Defendants' answers to the complaint were due, variously, on August 5, August 8, and August 9. They filed their motion to dismiss on the earliest of these dates. Plaintiffs made no motion for preliminary injunctive relief. As a result, the Court has not been asked to rule on their requests for injunctive relief without deciding the

---

[3] The Court finds no merit whatsoever in Plaintiffs' contention that the existence of the suit had been reported in the newspapers and Defendants could have reviewed it and responded to it via PACER. (Pls.' Opp'n 4.) Plaintiffs cite no authority for the implicit suggestion that Defendants could have served themselves with process.

merits of the case.  Plaintiffs displayed no urgency at all in their prosecution of this suit, and, consequently, laches bar their requests for a rerun of the Primary.  That election's results will not be disturbed.  To the extent that Plaintiffs' request for federal observers applies to a repeated Primary, the Court concludes that, too, is barred by laches.   To the extent that Plaintiffs' complaint can be read to request federal observers for future elections, laches do not apply to that portion of the lawsuit.

### B.  *Merits of the Motion to Dismiss*

Plaintiffs' opposition to Defendants' motion indicates they are asserting three federal causes of action:  Fourteenth Amendment equal protection, Fifteenth Amendment abridgment of right to vote on account of race, and Voting Rights Act violation.  (Pls.' Opp'n 5–10.)  They also assert the Court has supplemental jurisdiction over their complaints that Maryland state election laws were not followed.

#### 1.  *Fourteenth Amendment Claim*

Plaintiffs argue their central allegation as to equal protection is "that the State has diluted their votes by engaging in voting schemes or practices as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'"  (*Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).)  A claim of denial of equal protection necessarily rests on a plausible allegation of differential treatment of members of a protected class due to discriminatory intent. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Plaintiffs' complaint utterly fails to allege, other than in a conclusional fashion, that Defendants' conduct that may have resulted in election irregularities denied any Baltimore City voter equal protection of the law.   Plaintiffs allege that approximately 63% of the City's

population is African-American.   (Am. Compl. ¶ 17.)   From that statistic, Plaintiffs seem to argue that electoral irregularities in the City must be discriminatory towards African-Americans, who are a protected class.   But Plaintiffs fail to allege that non-African-Americans in Baltimore City were *not* subject to the effects of electoral irregularities, and they have not alleged any facts showing that Defendants acted differently towards voters in other jurisdictions, whether or not they are dominated, population-wise, by members of a particular race.   Thus, they have failed to allege differential treatment based upon membership in a protected class.   Beyond that, Plaintiffs advance no plausible allegation that any irregularities occurred because of a discriminatory intent.   The only allegation in this regard is that of the "vote-buying scheme"; however, Plaintiffs have not alleged that conduct is attributable to Defendants.   Their claim of denial of equal protection fails to state a claim for relief.

### 2.   *Fifteenth Amendment*

Plaintiffs indicate this claim "mirrors" their Fourteenth Amendment claim.   (Pls.' Opp'n 8.)   For the reasons stated above, Plaintiffs' Fifteenth Amendment claim also fails to state a claim for relief.

### 3.   *Voting Rights Act*

Plaintiffs claim Defendants violated section 2 of the VRA.   That statute is codified at 52 U.S.C. § 10301, which provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation

by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Plaintiffs' claim under the VRA rests upon the same allegations of the complaint that were the basis for their Fourteenth Amendment and Fifteenth Amendment claims.  For the same reasons stated above, their VRA claim fails to state a claim for relief.

### 4.  *Supplemental Jurisdiction*

To the extent that the complaint may be read to allege violations of Maryland state election laws, the Court, having ruled adversely to Plaintiffs on all of their federal claims, declines to exercise supplemental jurisdiction over any state claims.  *See* 28 U.S.C. § 1367(c)(3).

## V.  *Conclusion*

The Court concludes none of Plaintiffs' federal claims have merit.  Plaintiffs' state law claims will be dismissed without prejudice to their being filed in Maryland state court.

DATED this 13th day of October, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

13